LAW OFFICES OF
## JEFFREY LICHTMAN
11 EAST 44TH STREET
SUITE 501
NEW YORK, NEW YORK 10017
www.jeffreylichtman.com

JEFFREY LICHTMAN
JEFFREY EINHORN
JASON GOLDMAN

PH: (212) 581-1001
FX: (212) 581-4999

September 22, 2021

**BY ECF AND HAND DELIVERY**
Hon. Alvin K. Hellerstein
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re: **United States v. Luka Klasinc**, 21-CR-443 (AKH) (S.D.N.Y.)

Dear Judge Hellerstein:

### A.     INTRODUCTION

    Pursuant to 18 U.S.C. § 3145(b), the defense respectfully appeals Magistrate Judge Kevin N. Fox's June 8, 2021 detention order.[1] In reviewing a magistrate judge's determination on bail, a district court "should not simply defer to the judgment of the magistrate, but reach its own independent conclusion." United States v. Zahrey, No. 96 CR 910, 1996 WL 650980, at *1 (E.D.N.Y. Nov. 7, 1996) (Gershon, J.) (quoting United States v. Leon, 766 F.2d 77, 80 (2d Cir. 1985)); see also United States v. Duncan, 897 F. Supp. 688, 689-90 (N.D.N.Y. 1995) (district court is bound to undertake a complete, *de novo* review of the matter).

    Despite his status as a Slovenian national, it is respectfully submitted that Mr. Klasinc is eminently bailable, and the government cannot overcome their burden of demonstrating that no "conditions" exist which will "reasonably assure" his "appearance" in court and the "safety" of the "community," (see 18 U.S.C. § 3142 (f)) particularly in light of the restrictive conditions of

---

[1] A transcript of the proceedings, including Magistrate Judge Fox's oral decision, is attached hereto as Exhibit A.

**JEFFREY LICHTMAN**

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 2

release that we propose today. Notably, the decision to detain Mr. Klasinc due to flight risk at his first appearance followed a defense proffer consisting solely of conditions of surrendering his passport, abiding by a curfew, and living with a friend in Manhattan; the defense offered nothing of any substance to lessen concerns about flight risk. With this submission, the defense offers electronic monitoring, a $1 million bond backed by $1 million in cash and the property of a 30-year friend who is willing to put his life savings and family homes on the line for Mr. Klasinc to be released.

*First*, Mr. Klasinc poses no credible risk of flight.[2] Mr. Klasinc, 48 years old, is an internationally recognized figure and a high-profile individual, having competed in the 1992 Olympic games as a figure skater. He is the father of two adult children and has been married to his wife, a school teacher, for over 20 years. And, while he is not a citizen of the United States, he willingly came to this country *knowing* that an investigation into his company and its associated bank accounts was in progress for approximately nine months. See Complaint, at ¶¶ 12, 14. Indeed, Mr. Klasinc had originally booked his flight as a round trip ticket (see Airline Confirmation, attached as Exhibit B), planning to spend approximately one week in New York to address the issues with his bank, and to fly out on June 7, 2021. While speaking with a representative at his bank on Thursday, June 3, Mr. Klasinc was informed that the matter would require additional time. After not hearing from the bank at all the following day, and with original plans to fly out after the weekend, Mr. Klasinc postponed his return flight from June 7 until June 9 in order to continue with the bank's investigation. Hence, not only did Mr. Klasinc voluntarily come to the country investigating him, *he actually extended his stay while that investigation was prolonged.* While Mr. Klasinc eventually did plan to take his June 9 return flight, this was *only after* Mr. Klasinc exhausted his efforts with the bank concerning the issues which have now led to the instant matter. Mr. Klasinc would have remained even longer, however, his wife's father had just passed away and Mr. Klasinc needed to be home to provide emotional support to her and to attend services.[3] This behavior – namely, flying *overseas and into* the country where an investigation is already underway – is simply not indicative of an individual who plans to abscond in the face of pending criminal charges. Rather, it is indicative of an individual who plans to remain in the jurisdiction, attend his court dates, and fight to exonerate himself from these allegations.

---

[2] At Mr. Klasinc's initial appearance the government did not argue that he presented a danger to society if released. See Exhibit A, at pp. 8–12.

[3] Mr. Klasinc, however, had been planning on a return back to America in late June in order to continue with his production of the 2021 WinterWorld activation, discussed in greater detail infra.

JEFFREY LICHTMAN

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 3

  Further, the Indictment charges Mr. Klasinc with one count of bank fraud, wherein he is alleged to have made certain misrepresentations and alterations to numerous Economic Injury Disaster Loan applications ("EID Loans"). The Indictment also charges Mr. Klasinc with one count of aggravated identity theft, wherein he is alleged to have falsified a document from the United States Small Business Administration ("SBA"). See Indictment. As it relates to Count One, a fraud charge of this nature has a base offense level of 7. See 18 U.S.C. § 1344; U.S.S.G. § 2B1.1(a)(1). As it is alleged today, Mr. Klasinc's offense involved a loss of just over $1.5 million, which increases the offense level by 16 (see U.S.S.G. § 2B1.1(b)(1)(I)), however, should the actual loss amount be shown to fall under $1.5 million, the offense level would increase by 14. Further, we anticipate that the government will allege that two, two level enhancements for use of sophisticated means and claiming to act on behalf of the government will apply. U.S.S.G. §§ 2B1.1(b)(10)(C), (b)(9)(A). Therefore, with an offense level of at most 27, Mr. Klasinc, with no criminal history, has an anticipated sentencing guidelines range of 70-87 months for Count One – *prior to any acceptance of responsibility*. Count Two – which charges Mr. Klasinc with aggravated identity theft – requires a mandatory minimum of an additional 24 months to run consecutive to Count One. Therefore, Mr. Klasinc's anticipated exposure should he plead guilty to the Indictment *without any benefit of a plea agreement* underscores the conclusion that he does not have a massive incentive to flee from a case he knew was in the offing when he traveled to the United States in June; the penalty for absconding dwarfs his potential sentence should he be convicted of all charges at trial.

  *Second*, the bail conditions we propose ameliorate any fears that Mr. Klasinc is a flight risk. If granted bail, Mr. Klasinc will pay to lease a government-approved apartment within this district and agree to 24 hour home confinement, which will be strictly monitored by pretrial services through a GPS bracelet – ensuring that he does not flee. Moreover, Mr. Klasinc would agree not to use cellphones, and he would not use a computer for any purpose other than the review of discovery and note taking. Additionally, he would permit the government to search his residence at any time to ensure compliance with the conditions of his release. Finally, the proffered bail conditions will include that Mr. Klasinc have no contact or association with any BOB77, LLC business.

  Perhaps most importantly, we would consent to a bond of $1 million, secured by $1 million in cash and property put up by Robert Knox, who has placed his unwavering trust in Mr. Klasinc, who he has known for over 30 years. Mr. Knox is a friend and mentor to Mr. Klasinc, who became Mr. Klansinc's figure skating coach when he was just 15 years old. At that time, Mr. Klasinc, as a young teenager, had left his family and relocated to from Slovenia to Chicago for training. Mr. Knox went on to instruct Mr. Klasinc for a number of years, culminating in Mr. Klasinc's appearance at the 1992 Olympic games. Even after their professional relationship had ended, the two remained lifelong friends. Approximately six years ago, Mr. Klasinc took his family to visit Mr. Knox in Illinois, and Mr. Knox had recently planned to travel with his wife to

JEFFREY LICHTMAN

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 4

Mr. Klasinc's hometown in Slovenia once pandmic-related travel restrictions eased. Mr. Knox now runs his own small business which specializes in land and property maintenance throughout Illinois.

The property that Mr. Knox has volunteered to put up as security for Mr. Klasinc's release was purchased for his daughter, Grace, in August of 2021. The property was purchased for $576,000.00, and has been renovated with approximately $60,000.00 in upgrades. Similarly, Mr. Knox is also volunteering to put up $415,000 in cash to secure Mr. Klasinc's bond, which will be coming out of Mr. Knox's current residence as a home equity loan. Undoubtedly, given Mr. Klasinc's long, loyal, and loving relationship with Mr. Knox, dating back to when he was a teenager, it is impossible to suggest that Mr. Klasinc, a man with no criminal history, would now flee the country and trigger the eviction of Mr. Knox and his daugher from their homes.

*Finally*, Mr. Klasinc is at least as bailable – if not a better candidate for release – than other non-citizen defendants – discussed in greater detail infra – who were released on conditions in the Eastern and Southern Districts of New York while facing fraud prosecutions far exceeding that of Mr. Klasinc. See, e.g., United States v. Nejad, 18 CR 224 (ALC) (S.D.N.Y.) (Iranian national alleged to have funneled $115 million from the United States to Iranian entities and individuals); United States v. Ng, 18 CR. 538 (MKB) (E.D.N.Y.) (Malaysian national extradited to the United States alleged to have participated in a scheme to embezzle some $2.7 billion). The conditions of release that we propose are similar to that demanded of Nejad or Ng, who both faced exponentially larger white collar prosecutions, and as such, Mr. Klasinc should also be freed pending trial.

### B.   SUMMARY OF THE CHARGES

Mr. Klasinc is charged in a two count Indictment with one count of Bank Fraud, in violation of 18 U.S.C. § 1344, and one count of Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A. The Indictment alleges that from on or about October of 2020 until on or about June of 2021, Mr. Klasinc did "execute a scheme and artifice to defraud a financial institution ... by means of false and fraudulent pretenses [by] present[ing] false documentation to a financial institution in an attempt to secure the release of frozen funds to which he was not entitled." See Indictment at p. 1. Moreover, the Indictment alleges that the defendant, on October 5, 2020, "knowingly did transfer, possess, and use, without lawful authority, a means of identification of another person, during and in relation to a felony violation [by] submitt[ing] a falsified document purporting to be a letter from the U.S. Small Business Administration, bearing the name and signature of [a] specific real individual ...." Id. at p. 2.

The June 2021 Complaint alleges much more detail as to the charged conduct. Specifically, the Complaint alleges that Mr. Klasinc, in 2019, opened three business bank

**JEFFREY LICHTMAN**

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 5

accounts related to BOB77, LLC, an event management company which "stages major ice-themed amusement park style events ...." See Complaint at ¶ 4. Mr. Klasinc opened these accounts with "bank-1," and during the summer of 2020, and these accounts received a total of $1,595,800 from the United States SBA pursuant to eleven EID Loans. Id. Moreover, it is alleged that approximately eight of these eleven applications were altered in order to direct the deposits into the BOB77, LLC bank accounts, as opposed to the accounts initially specified on the original EID Loan Applications. Id. at ¶ 10. During this same time period, the Complaint alleges that there were numerous wire transfers from the BOB77, LLC business accounts to international beneficiaries. Id. at ¶¶ 4, 11. Mr. Klasinc's accounts were then frozen, and, when he was ultimately questioned regarding this activity, he allegedly wrote to the bank that the SBA deposits were "investment participation ... not a loan." Id. at ¶ 12. Furthermore, according to the government Mr. Klasinc then included in his email a letter from an SBA employee which confirmed that the deposited money was an investment into his company. Id. The Complaint alleges, however, that this letter was fraudulent, and that the SBA employee referenced did not issue the letter nor affix his signature or give permission for his signature to be affixed to it. Id.

### C.   THE PROPOSED BAIL PACKAGE

With this application, Mr. Klasinc proposes that Your Honor adopt the following package, which while not "excessive" (U.S. Constitution amend. VIII) will "reasonably assure the appearance of [the defendant] as required." See United States v. Sabhnani, 493 F.3d 63, 75 (2d Cir. 2007); see also United States v. Madoff, 586 F. Supp.2d 240, 249 (S.D.N.Y. 2009) ("The [Bail Reform] Act does not require that the risk be zero, but that conditions imposed reasonably assure appearance") (internal quotation marks omitted).

The proposed bail package includes the following conditions securing the defendant's pretrial release:

- Self-funded residence to be rented by him in the Southern District of New York;

- A personal recognizance bond for $1 million, secured by $585,000 in equity from the properties owned by Robert Knox in the United States, and $415,000 in cash;

- Strict pretrial supervision;

- GPS location monitoring;

- Home incarceration with only visitors pre-authorized by the government permitted inside;

JEFFREY LICHTMAN

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 6

- No contact between Mr. Klasinc and any known victims or witnesses, should any exist;

- No use of the internet;

- No involvement with "BOB77, LLC" business or contact with employees of said business, should any exist;

- Surrender of Mr. Klasinc's passport and any other travel documents with no renewals;

- No use of cellular telephones by the defendant, and computer use restricted to the review of discovery and note taking for his defense; and

- Permission for the government to search the defendant's residence and to tap his telephone to ensure compliance with the conditions of his release at any time.

D.  **ARGUMENT**

The Supreme Court has observed that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." United States v. Salerno, 481 U.S. 739, 755 (1987); see also Sabhnani, 493 F.3d at 75 ("it is only a limited group of offenders who should be denied bail pending trial") (internal quotation marks omitted). Indeed, "[t]he Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes" (id. at 747) and directs the release of the defendant "subject to the least restrictive" conditions determined by the court which will "reasonably assure the appearance of the person" at trial. 18 U.S.C. § 3142(c). Further, a district court may not deny pretrial release based solely on sweeping assertions of flight risk arising from a defendant's nationality. See Hung v. United States, 439 U.S. 1326, 1329 (1978) (granting Vietnamese national's bail because while the inability to procure his return suggest "opportunities for flight," it does not "establish any inclination" for such).

Here, as the government must concede, none of the § 3142(f)(1) factors that trigger the presumption of detention are met; rather, the Indictment charges Mr. Klasinc with Bank Fraud and Aggravated Identity Theft, which are no doubt bailable offenses. See 18 U.S.C. § 3142(e)(2) (creating a limited class of offenses identified in § 3142(f)(1) wherein a rebuttable presumption against bail exists). Accordingly, the government must overcome a substantial burden in proving that Mr. Klasinc poses a "serious" flight risk or there exists a "serious" risk that he will seek to obstruct justice in his case, in order for their request for pretrial detention to be granted. 18 U.S.C. §§ 3142(f)(2)(A) and (B). Therefore, Mr. Klasinc stands before this Court as both

**JEFFREY LICHTMAN**

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 7

presumptively innocent, see 18 U.S.C. § 3142(j), and presumptively eligible for pretrial release. See, e.g., United States v. Scarpa, 815 F. Supp. 88, 91 (E.D.N.Y. 1993) (pretrial detention "has been and should remain the exceptional practice") (emphasis supplied); United States v. Berrios-Berrios, 791 F.2d 246, 250 (2d Cir. 1986) (pretrial detention is a drastic measure, narrowly reserved for "extreme case[s]").

To rebut the latter presumption – that the defendant is eligible for pretrial release – the government must prove that there are no "conditions" which will "reasonably assure" Mr. Klasinc's "appearance." See 18 U.S.C. § 3142 (f). As shown below, the government will be unable to meet this burden – especially in light of the restrictive conditions of release that we propose.

### The Effect of Pretrial Detention on the Presumably Innocent Defendant

Before turning to a more detailed analysis of the relevant facts and legal principles involved, a few observations concerning the practical realities facing a defendant committed to pretrial detention are appropriate.

Certainly, the best exposition of the real consequences of pretrial detention is found in Judge Weinstein's decision in United States v. Gallo, 653 F. Supp. 320, 336-339 (E.D.N.Y. 1986). There, Judge Weinstein explained that being held in pretrial detention involves far more than merely the deprivation of an individual's liberty. Id. at 336. The obstacles and difficulties which are visited upon a defendant and his counsel, as well as their ability to effectively prepare a defense against serious criminal charges, can be almost empirically measured. Id. at 337. As Judge Weinstein noted:

> [A]ll of these hardships, including deterioration of [the defendant's] morale, demeanor, finances, resources, reputation and quality and thoroughness of legal defense, may combine to disadvantage the defendant at the judgment and sentencing stages of the proceeding. As to judgment, studies have indicated that the tension is likely to increase the chances of conviction at trial.

Id.

In Gallo, Judge Weinstein underscored the need for a careful "balancing" by the trial court. Id. at 338. He urged his brethren to consider the detention equation beyond the perspective of quantifying the amount of information presented by the government. Id. at 338-39. Instead, he emphasized the importance of carefully weighing the less tangible – but surely

**JEFFREY LICHTMAN**

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 8

deleterious – effects of pretrial detention upon an individual's ability to effectively defend himself.

In Scarpa, another decision by Judge Weinstein, he emphasized his concern for this process, stressing that preventive detention on the basis of future dangerousness should be the "exceptional practice." Scarpa, 815 F. Supp. at 91. As the court noted:

> It is well to remember the magnitude of the injury that pre-trial detention inflicts and the departure that it marks from ordinary forms of constitutional government. Executive power to detain an individual is the hallmark of the totalitarian state. Under our Constitution the prohibition against excessive bail, the Due Process Clause of the Fifth Amendment, the presumption of innocence – indeed, the fundamental separation of powers among the legislative, the executive and the judicial branches of government – all militate against the abhorrent practice. Our historical approach eschewing detention prior to trial reflects these concerns.

Id.

As this Court is undoubtedly in a position to observe, applications for preventive detention by the United States Attorney's Office have grown with alarming frequency. Applications seeking to hold an accused without bail have become commonplace. Although figures are unavailable, it is certainly true that there are hundreds of federal defendants presently housed at the local detention centers throughout New York State.

These issues are raised with the Court for several reasons. *First*, it is important that the degree of scrutiny brought to a matter as serious as the deprivation of an individual's liberty prior to conviction does not erode because the practice itself has become more commonplace. *Second*, the effect of pretrial detention upon the accused's ability to defend himself must be considered when evaluating the prosecutor's application. Even if a prosecutor is merely pursuing what he or she perceives to have become an accepted practice, the inescapable conclusion remains that the accused's ability to defend is materially affected. This is especially heightened in a case such as this, where the discovery is extraordinarily voluminous, requiring high powered computers even to access much of the material, and the defendant has already been severely restricted in accessing the discovery while incarcerated at the Metropolitan Detention Center, a facility which has experienced prolonged lock downs during the ongoing global health pandemic.

JEFFREY LICHTMAN

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 9

## It Cannot Be Credibly Argued that Mr. Klasinc Poses a Risk of Flight

Other than his foreign citizenship, there is nothing to suggest that Mr. Klasinc poses a risk of flight. While the nature of the charges surely weigh upon this application, specifically the amount of money that Mr. Klasinc allegedly received from the United States SBA, this number pales in comparison to other similarly situated foreign nationals who have been granted pretrial release in the Eastern and Southern Districts of New York, and an examination of the balance of the 18 U.S.C. § 3142(g) factors, reviewed below, supports his release. Finally, the proposed bail package, which include 24 hour GPS monitoring and home confinement at a self-funded apartment, and a $1 million personal recognizance bond secured by $1 million in property and cash, certainly "assure[s] the appearance of" the defendant and the "safety of the community." 18. U.S.C. § 3142(e).

The argument that Mr. Klasinc is a flight risk due to his limited ties to the United States is also rebutted by the fact that, since 2019, he has had legitimate business dealings within the country. To be sure, Mr. Klasinc was in New York for approximately three months during the summer and fall of 2019, at which time he was finalizing plans for a WinterWorld interactive pop-up event – an ice-themed amusement park within the city that typically runs from three to six months.[4] At this time, Mr. Klasinc had already entered into paid contracts with sponsors, partners, and production agencies to help execute the event. See Exhibit Legacy Agency Contract, attached as Exhibit D. The only reason the event did not come to fruition is due to the COVID-19 pandemic. With the pandemic subsiding, Mr. Klasinc, prior to his arrest, was working towards reestablishing the event for the winter of 2021 while using both old and new partners to help with production.

    i.    Applicable Law

In determining whether there are conditions of release that will "reasonably assure" the appearance of Mr. Klasinc at future court appearances, the following should be considered:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a Federal crime of

---

[4] Since his retirement from professional skating approximately 20 years ago, Mr. Klasinc has focused on building community ice rinks, starting with smaller facilities within Slovenia and growing to become multi-faceted event and program spaces around the world. Similar activations were previously put on by Mr. Klasinc's company in both Mexico City and Slovenia. Photographs of those events are attached hereto as Exhibit C.

JEFFREY LICHTMAN

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 10

> terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including--
>
> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>
> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. In considering the conditions of release described in subsection (c)(1)(B)(xi) or (c)(1)(B)(xii) of this section, the judicial officer may upon his own motion, or shall upon the motion of the Government, conduct an inquiry into the source of the property to be designated for potential forfeiture or offered as collateral to secure a bond, and shall decline to accept the designation, or the use as collateral, of property that, because of its source, will not reasonably assure the appearance of the person as required.

See 18 U.S.C. § 3142(g). Finally, as this Court is aware, the "government's burden of proof on the question of risk of flight is ... by a preponderance of the evidence." See e.g., United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985).

    ii.    The Nature of the Charges

Mr. Klasinc is not charged with an offense – such as a crime of violence, terrorism, or one that involves a minor victim or controlled substance, firearm, or explosive – for which the bail statute dictates a rebuttable presumption of detention. See 18 U.S.C. § 3142(e)(2). Rather, Mr. Klasinc is alleged to have applied for numerous EID Loans and to have redirected the

**JEFFREY LICHTMAN**

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 11

proceeds from certain loans into his business's bank accounts, and, when confronted, allegedly executed a fraudulent letter from an SBA employee.

While the Complaint and Indictment allege that Mr. Klasinc obtained approximately $1.5 million from his scheme, and therefore the government presumably will argue that he has access to vast wealth, courts in this district have routinely found that pretrial release is appropriate for foreign defendants with both financial means and limited ties to this country. See, e.g., United States v. Bodmer, No. 03 CR 947 (SAS), 2004 WL 169790, at *3 (S.D.N.Y. January 28, 2004) (releasing Swiss national on bail); United States v. Khashoggi, 717 F. Supp. 1048, 1050-52 (S.D.N.Y. 1989) (releasing "enormously wealthy" Saudi Arabian national who was facing mail fraud charges despite the fact that there was no extradition treaty in place). Examples of other defendants who are similarly foreign nationals are detailed, infra.

      iii.     The Weight of Evidence Against Mr. Klasinc

It is somewhat difficult to discern the evidence against Mr. Klasinc at this stage. While a detailed complaint was filed and substantial – but not all – discovery has been provided, counsel has had limited opportunity to review the evidence with Mr. Klasinc due to the varying and unpredictable visitation hours at the MDC, as well as Mr. Klasinc's extremely limited opportunity to use a computer. Essentially, and as described, supra, the government claims that Mr. Klasinc applied for certain EID Loans, and caused other EID Loans to have funds redirected to his business's bank accounts as opposed to the original bank accounts included on the applications. See Complaint at ¶10. The government further advances that when his bank accounts became frozen and he was confronted about these loans, Mr. Klasinc falsified a letter from the SBA, which outlined that said loans were properly deposited into his business's account as an investment. Id. at ¶12.

Importantly, a substantial portion of the government's discovery produced thus far is derived from Mr. Klasinc's cellphone. Upon being interrogated following his arrest, Mr. Klasinc allegedly waived his *Miranda* rights and consented to having his cell phone searched, both of which he vehemently denies and which will be the subject of a future suppression motion and hearing to determine if such evidence was obtained in violation of his constitutional rights.

      iv.     The Defendant's History and Character

We have received over 15 letters from friends and family members on behalf of Mr. Klasinc in support of this application.[5] The letters describe a "great man" (Letter of Ester Kovse,

---

[5] Additional letters are attached hereto as Exhibit S.

JEFFREY LICHTMAN

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 12

attached as Exhibit E), who is an "extremely decent and trustworthy person" (Letter of Mitja Tripkovic, attached as Exhibit F) and one who "poses no danger of traveling anywhere because he wants to prove his innocence and fight this matter ...." See Letter of Miran Kovse, attached as Exhibit G.

*First*, Mr. Klasinc's loved ones are universally shocked that Mr. Klasinc could be charged in any crime based on their experiences with him. See Letter of Management of Ice and Roller Skating Club Olympia, attached as Exhibit H ("We received information that Luka was suspected of serious criminal acts, which really surprised us ...."); Ltr. of Miran Kovse, Ex. G (noting that she "can hardly belive that [Luka] did something wrong because everybody knows him as a very honest and modest person"); Letter of Aleksandra Kovse, attached as Exhibit I ("[Luka] is honest and he fulfill[s] everything that he says."); Letter of Barba Kastelic Durjava, attached as Exhibit J ("I am horrified and I cannot believe that he really committed the alleged crime ....).

*Second*, several of the letters emphasize that Mr. Klasinc poses no risk of absconding, especially given that Mr. Klasinc "definitely want[s] to fight his case to the end and prove his innocence." Ltr. of Mitja Tripkovic, Ex. F. Echoing this sentiment, Dr. Pradip Kharekumar adds:

> [Luka] is not the kind of person who would 'jump the bail' or 'run away and hide' – as that would completely and permanently tarnish his name and reputation that he has worked so hard all his life to build. His main concern is to stay and resolve the matters .... He has a wife and grown-up children, and many relatives and friends. He is devoted to all of them. For their sake also, I think he would never do a thing like jumping the bail and bring them misery and grief.

See Letter of Dr. Pradip Kharekumar, attached as Exhibit K; see also Letter of Marko Zula, attached as Exhibit L ("In my humble opinion, [Luka] will face these charges and prove his innocence.").

Others also remark on their firm belief that Mr. Klasinc "is not a flight risk" due, in part, to his unwavering commitment to fight these allegations and clear himself of any wrongdoing. See Letter of Primoz Pirc, attached as Exhibit M. Indeed, as Primoz Irsic writes in his letter for the Court:

> I am aware Luka was charged with crimes, but I can confirm to you, that he will fight this case until the end. He will for sure stay

JEFFREY LICHTMAN

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 13

> in [the] U.S. and he has no intention to travel anywhere before he will prove his side of story and that he is innocent. If you approve the bail, he will definitely not take advantage of it but will follow all the instructions given to him.

See Ex. N; see also Letter of Rok Misvelj, attached as Exhibit O ("[I]t's simply not [Luka's] nature not to fight to the end and defend his actions. That's why I believe he doesn't have any intention to leave the United States until he clears his name and defends himself honestly."); Letter of Zala Kovse, attached as Exhibit P ("Luka will not travel from the county and ... will abide by the terms and the agreement, as he has always been a man of his word and has always taken responsibility for his actions."); Ltr. of Aleksandra Kovse, Ex. I (Luka "will certainly remain in the United States until he proves that the charges are not true. He is a man who does not run away from problems, but always wants to prove the truth.").

Other writers have observed instances which demonstrate that Mr. Klasinc is a "selfless" man (Ltr. of Management of Ice and Roller Skating Club Olympia, Ex. H), who is a "good and decent person with a lot of generosity and responsibility." See Letter of Ines Kovse, attached as Exhibit Q. Ms. Kovse notes in her letter for the Court that Mr. Klasinc is "a friend who is hard to find and everyone could just wish for." Id. Indeed, Ms. Kovse recalls that when she was diagnosed five years ago with Fibromyalgia – a musculoskeletal chronic pain – Mr. Klasinc,

> devoted [a] big part of his own life just to me. If necessary, he always comes also in the middle of the night, takes me to the doctor when I faint, thinks for me when I lose my memory, helps me with daily work and activities that are completely normal for others .... If it weren't for Luka, my life now would be completely different ....

Id. Ester Kovse, a friend, expands on Mr. Klasinc's compassionate ways, writing for the Court:

> [Mr. Klasinc] is really caring and ... was happy to take time for everyone .... I was happy because it was obvious that he was not just a boss but a really kind-hearted man who cared about people .... Because of him, I fell in love with skating and rollerblading and he also help[ed] me choose and order new real figure skates for me for winter season and professional rollerblades for summer season.

See Ex. E. Barabara Kastelic Durjava, Mr. Klasinc's cousin, includes that Mr. Klasinc is "dedicated to his family and work. He worked hard 24/7 and built a successful business career,

JEFFREY LICHTMAN

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 14

his family always stood by his side [and] he still loves the woman he fell in love with as a teenager." See Ex. J.

Similarly, friend Aleksandra Kovse recalls how Mr. Klasinc helped her daughter in many different facets of life:

> [Mr. Klasinc] devoted himself even more to my daughter, who, due to her age, could not train in any other club .... Luka took her also in his skating club for free and helped her with all his time and energy to become an excellent skater .... [H]e is a friendly, warm person and that the most important for him is good understanding with employees and people around him .... Because [] our daughter also had health problems, she needed help several times, but we would not provide her because we live too far away. In such moments, Luka was always by her side helping her with advice and always available when she had to go to the doctor, in the middle of the night to the emergency room or he went to pick her up in the hospital, because due to the medications, they didn't let her out by herself. <u>I can say that he was like a second father to her and was always available if she needed help. I am very grateful to him for this as I was able to trust that my child was in good hands.</u>

See Ex. I (emphasis supplied); see also Ltr. of Marko Zula, Ex. L ("I know him as a serious and reliable business partner and a decent and helpful person."); Letter of Mateja Avbreht, attached as Exhibit R ("I can ... say and admit that Luka was always willing to give away a few hours of ice for adult and recreational skating. So he was always generous and invited me many times to participate at his hours of skating."); Ltr. of Primoz Pirc, Ex. M (Luka is a "hardworking person and in this role he has always proved to be an honest person you can easily rely on."); Ltr. of Miran Kovse, Ex. G ("Luka is a good and honest man who often helps .... I also remember when he provided free skating for all the kids from kindergarden, then he had free individual lessons for those kids whose parents didn't have the money, he also donated skates so the kids could skate.").

### Many Less Likely Candidates Have Been Released on Bail

As noted in the Introduction, pretrial release in this case would not be unreasonable – with many seemingly less suitable candidates routinely being granted bail who similarly are foreign nationals and charged with <u>significantly larger</u> white collar frauds. For example:

JEFFREY LICHTMAN

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 15

- Roger Ng, a Malaysian national and former banker for Goldman Sachs, was granted bail after agreeing to post a $20 million personal recognizance bond secured by $1 million cash. See United States v. Ng Chong Hwa, 18 CR 538 (MKB) (E.D.N.Y.). Mr. Ng was extradited to the United States from Malaysia to face charges that he participated in a scheme to embezzle some $2.7 billion from 1MBD, the Malaysian state fund.

- Ali Sadr Hashemi Nejad, an Iranian national with access to untold wealth – billions of dollars – was granted bail via a $20 million bond secured by multiple properties and cash. See United States v. Nejad, 18 CR 224 (ALC) (S.D.N.Y.) (Dkt. Entry 31). Mr. Nejad was arrested while attempting travel to London from the United States, and according to the government, he lied to pretrial services about his country of residence in an effort to appear more bailable. See United States v. Nejad, 18 CR 224 (ALC) (S.D.N.Y.) (April 18, 2018 Bail Transcript).

- Adnan Khashoggi, an "enormously wealthy and well-known Saudi Arabian businessman," was released by Judge Keenan on a $10 million personal recognizance bond secured by $5 million in cash and $5 million in property. Khashoggi, 717 F. Supp. at 1050-52. Notably, at the time of his release, there was no extradition treaty in place between Saudi Arabia and the United States which would have facilitated his transport back to the United States if he had fled.

- Hans Bodmer, a Swiss national and attorney who was arrested in South Korea and charged with violating the Foreign Corrupt Practices Act by, *inter alia*, paying "bribes and authoriz[ing] the payment of bribes to various government officials of the Republic of Azerbaijan," was released by Judge Scheindlin on a $1 million bond secured by a letter of credit. Bodmer, 2004 WL 169790, at *3. This, despite the government's complaint that the Swiss government would not "recognize Bodmer's written waiver of his right to avoid extradition" if he fled. Id. at *2.

- Ng Lap Seng, a Chinese national and billionaire real estate mogul, was charged in a conspiracy wherein over $1.3 billion in bribes were funneled to former U.N. ambassador John Ashe. Despite possessing multiple private planes and being detained while onboard one leaving the United States, Mr. Seng was granted bail by Judge Broderick in the form of a $50 million personal recognizance bond secured by $20 million in cash and a residence. See United States v. Seng, No. 15 CR 706 (S.D.N.Y.) (Dkt. No. 53).

- Jeffrey Webb, a national of the Cayman Islands, was charged with bribery and money laundering related to the international soccer organization, FIFA. Webb

**JEFFREY LICHTMAN**

Hon. Alvin K. Hellerstein
United States District Judge
September 22, 2021
Page 16

> was released on a $10 million personal recognizance bond secured by real property, vehicles, and jewelry. See United States v. Webb, No. 15 CR 252 (E.D.N.Y.) (Scanlon, M.J.) (Dkt. No. 40).

What is more, still less bailable defendants – those charged with crimes of violence – are frequently released in the Southern and Eastern Districts of New York. See, e.g., United States v. Michael J. Persico, 10 CR 147 (E.D.N.Y. 2010) (son of life-imprisoned mob boss, an allegedly powerful Colombo associate charged with racketeering murder); United States v. Modica, 09 CR 1243 (S.D.N.Y. 2010) (powerful Gambino soldier facing racketeering charges including double murder, jury tampering, assault and extortion); United States v. Agate, 08 CR 076 (E.D.N.Y. 2008) (high ranking gangsters charged with violence); United States v. Cutaia, 08 CR 097 (E.D.N.Y. 2008) (same); United States v. Spero, 99 CR 520 (E.D.N.Y. 1999) (acting Bonanno boss facing four murder charges); United States v. John A. Gotti, 98 CR 042 (S.D.N.Y. 1998) (son of life-imprisoned mob boss, allegedly Gambino Acting Boss); United States v. Orena, 93 CR 1366 (E.D.N.Y. 1993) (alleged powerful Colombo Capo and son of Colombo Acting Boss).

Finally, Marc Dreier and Bernie Madoff – both less likely candidates for release than Mr. Klasinc – were also released on bail. First, according to the very judge who had granted him bail, Dreier "ranked with those who have committed some of the most egregious frauds in history." See United States v. Dreier, 09 CR 85 (JSR) (Dkt. No. 76, at p. 3) (internal quotation marks omitted). Specifically, as an attorney who "disgraced the venerable profession of law," Dreier engaged in a "series of frauds over a 7-year period" that exceeded $740 million, "largely to finance a personal life of extraordinary lavishness." Id. Moreover, Dreier's attempts to further and cover up his schemes were seemingly unending: "He impersonated clients .... He created phony client and accounting firm documents .... He stole from clients .... He misappropriated funds from bankruptcy-court approved accounts .... [and] [h]e offered to pay off accounting firm professionals." Id. at pp. 3–4. And even after he was arrested, "from a prison in Canada, he called his law firm and directed the transfer of millions of dollars from an escrow account to a personal account in his control." Id. at p. 4 (emphasis supplied).

Bernie Madoff's fraud was even greater than Dreier's in scope and duration – and he too was granted bail. A crime of "extraordinary dimensions" that resulted in a loss "greater than $13 billion," Madoff's fraud "affected thousands of investors in the United States and worldwide," and took place "for more than a generation." United States v. Madoff, 09 CR 213 (DC) (Dkt. No. 92, at p. 3). Madoff also went to great strides to hide his crimes as he defrauded "individuals, non-profit organizations and for-profit institutions," and "drove many ... to economic collapse." Id. at p. 4. Madoff "repeatedly lied to the United States Securities and Exchange Commission ('SEC') in written submissions and in sworn testimony," and "caused to be created fraudulent certified financial statements," which were sent to the SEC. Id. at p. 5. Indeed, nearly every financial statement that he created and sent out to clients for over twenty

**JEFFREY LICHTMAN**

years was false. Id. at p. 4. Further, "[w]henever an investigation threatened to uncover his fraud, Madoff resorted to obstruction and lies." Id. (emphasis supplied). And yet this individual was trusted to remain on bail until his case was resolved.

Surely if these individuals could be entrusted with pretrial release, so too can Mr. Klasinc, a man with far less means, who is alleged to have committed a much smaller fraud than those defendants observed above, and who is facing a sentence which would be more than doubled should he abscond, while causing his lifelong mentor and friend to lose a home and massive assets.

### E. CONCLUSION

For all the foregoing reasons, Mr. Klasinc's pretrial release should be granted.

Respectfully submitted,

Jeffrey Lichtman

Encs.

cc: All counsel (by ECF and hand delivery)